IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| LAWRENCE J. HILL, | ) |
| Plaintiff, | ) |
| v. | ) NO. 14-3283 |
| CAROLYN COLVIN, COMMISSIONER OF SOCIAL SECURITY, | ) |
| Defendant. | ) |

OPINION

RICHARD MILLS, U.S. District Judge:

Lawrence J. Hill seeks review, pursuant to 42 U.S.C. § 405(g), of the administrative law judge's decision denying his application for disability insurance benefits.

Pending are motions for summary judgment filed by both parties.

Plaintiff's motion is allowed.

The case is remanded.

I. INTRODUCTION

Plaintiff Lawrence J. Hill, who was born in 1965, is a high school

graduate with two years of college and has worked as a heating and air conditioning service technician. He filed an application for disability insurance benefits on October 12, 2011, alleging he had been disabled since March 11, 2010 following a car accident. The Plaintiff's application was denied initially and upon reconsideration.

The Plaintiff and his attorney appeared before an administrative law judge (ALJ) for a hearing. ALJ Diane Flebbe rendered a decision in April 2013 concluding that Plaintiff had the residual functional capacity to perform a reduced range of light or sedentary work subject to certain limitations. The ALJ further determined that jobs existed in significant numbers which the Plaintiff could perform. The Appeals Council denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II. BACKGROUND

### A. Medical evidence

The Plaintiff injured his left knee, right shoulder, head and neck in the car accident. Fractures were ruled out in the emergency room. He was

given an immobilizer due to a possible sprain of the knee ligaments. The Plaintiff continued to have pain and was sent to Ronald Romanelli, M.D., an orthopedic specialist. Dr. Romanelli observed his antalgic gait, his clinical signs and his difficulty getting in and out of the chair. The Plaintiff was sent for an MRI, which showed intact menisci, cruciate and collateral ligaments; a full thickness cartilage defect; a large cyst and joint effusion. He was given a cortisone shot, which did not really help, and continued to have "obvious swelling." The Plaintiff was scheduled for arthroscopy in June 2010. Dr. Romanelli observed clinical signs of injury. The arthroscope disclosed patellofemoral problems consistent with dashboard signs of injury. Dr. Romanelli observed a microfracture of the femoral head. He did extensive debridement.

Following the procedure, the Plaintiff was concerned about the swelling. He was told to ice the knee and take medications. There was still swelling at his next two appointments. The Plaintiff needed a wheelchair because crutches were not workable due to his large size. Swelling was persistent and was noted as a problem in therapy. The therapist noted that

his left knee was about 4 cm larger than his unimpaired right knee. The Plaintiff was prescribed a cold compression unit. The Plaintiff was able to use the therapy bike for six minutes but it caused increased pain. His problems persisted after weeks of therapy. The therapist again measured him and determined the Plaintiff had measurable swelling in the left knee. Dr. Romanelli observed "less" swelling after eleven weeks and therapy. Dr. Romanelli again observed swelling more than four months after the surgery, but noted that Plaintiff was doing better.

By October 2010, the Plaintiff was able to hit 18 golf balls without increased pain. When he tried to walk for 40 minutes, however, the Plaintiff had notable pain and fatigue. Soon thereafter, the Plaintiff stated that his knee "blowed up" following his last therapy. He believed that he tried to do too much in terms of testing the knee. On November 3, 2010, the therapist measured the swelling and it had increased by nearly a centimeter since the start of therapy. Two days later, Dr. Romanelli noted that Plaintiff continued to complain of pain and discomfort. However, he found "no abnormalities" and noted that "we need to get him back to

work."

On November 24, 2010, the Plaintiff's knee was measured before and after therapy. The range of motion decreased and swelling increased following therapy. On December 3, 2010, Dr. Romanelli said that Plaintiff is "still having a significant amount of swelling and effusion, which I cannot explain." "He still has a difficult time walking and walks with an antalgic gait." An MRI showed a small ruptured Baker's cyst, fluid collection in the bursa and edema, with thinning cartilage and a subtle subchondral lesion.

On January 7, 2011, Dr. Romanelli noted that Plaintiff still had some swelling but less so. Dr. Romanelli referred the Plaintiff back to the clinic and hoped he could return to work. Dr. Romanelli noted a procedure like an osteotomy could be undertaken, though he did not recommend it.

After therapy ended, the Plaintiff had another formal radiographic study in March 2012 which showed continued, worsened problems. These included a torn medial meniscus, a torn lateral meniscus, a full-thickness cartilage defect in the femoral condyle that was "stable" from the prior MRI, and two new full thickness tears in the lateral tibial plateau and in the

trochlear groove.

B. Hearing testimony

The Plaintiff testified he is 6'0" and weighs 285 pounds. He believes his weight affects his joints because his "extremities don't like all that extra weight." The Plaintiff lived in a mobile home and had trouble with the stairs getting in and out. He had to reinforce the stairs so he could grasp the railing, one step at a time, stabilizing after each step. Although he could still mow his yard, it took much longer due to the amount of time he had to rest.

The Plaintiff testified that since his surgery, he had trouble standing, walking and kneeling. His knee "swells up, gets really hot, I get sharp stabbing pains on the left, and then burning through the joint." The swelling was every day and he had a "hematoma" that swelled to the size of a small grapefruit.

The Plaintiff's daily treatment consisted of using a compression device that "compresses the knee and chills the knee at any time, and gets the heat and swelling down, and I have to keep it elevated." He had significant pain

in his knee, regardless of its position or whether he was sitting or standing. He propped his knee on a garbage can at the hearing for elevation. At home, he elevated it waist to chest high primarily by using a recliner. When sedentary at home, the Plaintiff still used the compression machine daily. If he did anything on his feet, he would have to use the machine right after to control the heat and swelling. He had to wear a metal hinged brace. Any activity caused the Plaintiff to "pay for it" with more swelling, more heat, having to leave the compression on longer or more often and poor sleep. He testified that any lifting and carrying aggravated the knee. He was not able to lift or carry anything close to a couple of hours per day and his wife and daughter did any needed lifting around the house. He avoided rough, uneven surfaces which tended to aggravate his knee.

The Plaintiff stated his pain medications made it impossible to drive due to drowsiness and slowed reactions. He was taking hydrocodone, meloxicam, gabapentin and cyclobenzaprine. These medicines "compounded" his problems of poor sleep. He was seeing a psychiatrist for anxiety and depression. The Plaintiff had problems with unhappiness,

7

irritability and a short temper.  He needed a break during the hearing for that reason.  The Plaintiff felt useless.  He got only a few hours of quality sleep each night due to discomfort caused by his knee.  He also had problems from arm surgeries performed before the accident.  The Plaintiff had been using assistants to do heavier lifting and carrying at work before the knee injury.  He was not able to lift 30 pounds even before that.

      The Plaintiff testified his activities in the home were very limited and broken up with bouts of reclining.  He shopped for groceries by using a power scooter.  He sat to cook, shower and dress.  He dozed off during the day.  During daylight hours, the Plaintiff estimated he was in his recliner with the leg elevated for a total of five to six hours.  The ALJ asked questions about computer use; he estimated he used a computer 20 to 30 minutes total per day.  He was not able to do more because "there's no way for me to raise my knee up and be at the computer at the same time."  He drove only about once a week and had no social life outside of the home.  He gave up his hobbies and pursuits, including even bank fishing (unable to walk on even ground) and Cardinal baseball games.

James Lanier, a vocational expert, testified that some sedentary jobs could be performed even if a person had to elevate the lower extremity "twelve inches" when seated. However, if he needed a break outside of normal scheduled breaks to elevate higher or use a compression machine, no jobs could be performed. If the Plaintiff needed the ability not just to switch from sitting to standing, but to move about at will, no jobs could be performed. As to the number of jobs, Dr. Lanier testified he used a program called "Skilltran." He did not independently verify the information but said he tried "to use other information" which he did not specify.

C. ALJ's Decision

ALJ Flebbe found that Plaintiff has the following severe impairments: left knee tears and minimal arthritis, cervical and lumbar spine degenerative changes, obesity, anxiety and depression. However, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d),

404.1525 and 404.1526). The ALJ stated that she considered the Plaintiff's obesity in the context of the overall record and listing of impairments.

The ALJ found that Plaintiff was capable of performing sedentary and light work except he could not climb ladders, ropes or scaffolds; had to avoid workplace hazards (heights and machinery); could "occasionally" climb ramps and stairs; needed a sit/stand option at will; and needed to use only scheduled break times to compress his knee with his compression machine. Because of the Plaintiff's mental impairments and symptoms, the Plaintiff was limited to jobs that do not require complex or detailed job processes and little in the way of change in the job process from day to day. He was limited to occasional work interaction with coworkers, supervisors and the general public.

The ALJ found that Plaintiff could not perform any past relevant work. Based on the jobs as described by Dr. Lanier, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform.

## III. DISCUSSION

### A. Standard of review

When, as here, the Appeals Council denies review, the ALJ's decision stands as the final decision of the Commissioner. See Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010). The Act specifies that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Yurt v. Colvin, 758 F.3d 850, 856 (7th Cir. 2014) (citations omitted). Although the Court's task is not to re-weigh evidence or substitute its judgment for that of the ALJ, the ALJ's decision "must provide enough discussion for [the Court] to afford [the Plaintiff] meaningful judicial review and assess the validity of the agency's ultimate conclusion." Id. at 856-57. "[A]n ALJ is not required to provide a complete and written evaluation of every piece of testimony and evidence, but must build a logical bridge from the evidence to his conclusion." Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015).

The Plaintiff alleges the ALJ erred at step 5 in considering whether the Plaintiff has the residual functional capacity to do any work. Specifically, the ALJ committed error in finding no need to elevate the lower extremity and by finding a need to apply compression only during a scheduled break. The Plaintiff claims a remand is warranted on that basis.

The Commissioner asserts the ALJ thoroughly analyzed the record and reasonably determined that Plaintiff was not disabled. In limiting the Plaintiff to light or sedentary work with certain restrictions, the ALJ's residual functional capacity assessment accounted for limitations caused by the Plaintiff's knee impairment.

B. ALJ's step five finding

The Plaintiff states that the ALJ summarized the notes of physical therapy in a brief paragraph of the decision. However, the paragraph mentions nothing about either swelling or the need for a compression device to alleviate it. The therapists noted the swelling and measured it and recorded it both before and after therapy and stated numerous times that Plaintiff needed to use compression and ice to alleviate it. The ALJ

mentions swelling and edema but states that his impairments "are not sufficiently serious to support the claimant's alleged level of limitations, given all of his functional abilities noted above."

The Commissioner claims the ALJ highlighted the relevant medical evidence. Following the arthroscopic knee surgery, the Plaintiff's condition was improving and physical therapy was helping. Although there was pain on palpation and consistent swelling in the knee, x-rays and MRIs showed that despite some clinical findings, there was nothing major wrong with the Plaintiff's knee.

The ALJ noted that the record did not document significant limitation in range of motion, muscle spasm, muscle atrophy, motor weakness, loss of sensation or reflex abnormality. Although the Plaintiff had a limp, he did not have difficulty ambulating without the need for an assistive device. The ALJ found that Plaintiff's mild swelling and pain on palpation did not support a finding of disability. The ALJ observed that Plaintiff generally did not receive the type of treatment one would expect from an individual experiencing debilitating pain. Moreover, both the Plaintiff and Dr.

Romanelli both thought he might be capable of teaching in his former field.

The Plaintiff asserts the most probative and objective evidence–the therapist's tape measure applied to his leg–indicated that activity in the therapeutic setting increased the swelling. There is no evidence that he was instructed not to use the compression device. Moreover, the record includes medical evidence supporting the Plaintiff's assertions of pain, swelling, and his need to elevate, compress and ice his knee, not on a scheduled basis but when the swelling worsened. Therefore, the ALJ's finding that he has no such need to elevate at all, and a need to compress and ice only during scheduled breaks, is unsupported by the record. The ALJ cites no evidence from the record in support of the finding. The need to elevate consistent with the Plaintiff's testimony would eliminate all jobs, according to Dr. Lanier. To the extent that the ALJ suggests that swelling was a major problem only in the immediate period after the Plaintiff's recovery from surgery, the record shows that the swelling and the use of compression continued well after that, as noted by his therapist after 59 therapy sessions that occurred over the course of more than six months.

The Commissioner states that swelling is a mere symptom, not a limitation, and an ALJ's residual functional capacity assessment, need only reflect the most the Plaintiff can do despite his limitations. See 20 C.F.R. § 404.1545(a). However, the ALJ did find that Plaintiff had severe impairments which included left knee tears and arthritis. Although the objective evidence may not show significant functional limitations in the Plaintiff's knee, an ALJ must address record evidence of a leg-elevation requirement. See Smith v. Astrue, 467 F. App'x 507, 510-11 (7th Cir. 2012) (unpublished) (reversing denial of claim because the ALJ did not explain her reasoning and "never considered Smith's RFC in light of her alleged need to elevate her leg or asked the VE how a leg-elevation requirement would affect Smith's job prospects"); Chase v. Astrue, 458 F. App'x 553, 556 (7th Cir. 2012) (unpublished) ("We agree with Chase that the ALJ overstepped his role by determining that the degree of foot elevation required by Chase was 15 to 20 degrees.").

The ALJ acknowledges that Plaintiff has swelling, though states that 30 minutes of using a compression machine would allow him to account for

the swelling. Therefore, the ALJ found that this could be done during a scheduled break. The Plaintiff contends that she cites no medical support for the finding and simply rendered an independent assessment without relying on evidence from a physician or medical professional. The ALJ notes that Plaintiff tried hitting golf balls and doing therapeutic exercises, though she did not mention the side effects (including swelling that was observed) that such activities brought about. Dr. Romanelli recommended use of a compression/cryotherapy machine long after the surgery and not simply for a brief post-surgery recovery period. From the beginning of physical therapy in July 2010 through December 2010, the measured size of swelling generally increased.

The Plaintiff contends the ALJ cited no evidence to support her finding that he need not elevate his leg and that he could accommodate compression and cryotherapy during scheduled breaks. The ALJ does not discuss the Plaintiff's testimony that he spent five to six hours per day during daytime hours with his leg elevated and used a compression/cryotherapy device as needed to address worsening swelling or

pain. Because the ALJ did not consider probative evidence that supported the Plaintiff's primary complaint which would, if accepted, rule out the ability to perform the jobs she cited at step five, the Plaintiff asserts the decision should be remanded for proper consideration of the evidence.

The Commissioner alleges the ALJ did account for the Plaintiff's treatment methodologies by asking the vocational expert about how those methodologies would affect an individual's ability to adjust to other jobs. The vocational expert testified that an individual could still perform sedentary jobs if he needed to elevate his leg 12 inches throughout the day when seated and there would be no vocational impact to using a compression device during customary breaks.

There is objective medical evidence which supports the Plaintiff's assertion that he needs to elevate his leg due to swelling and pain. The Plaintiff testified his leg was elevated for five to six hours per day. If, as the Plaintiff testified, he needed to elevate his leg to waist level (instead of knee level) and keep it elevated for more than 30 minutes, the Plaintiff would be unable to perform the jobs cited by the ALJ at step five. Additionally, if the

Plaintiff used a compression/cryotherapy machine when his leg swelled and not just during scheduled breaks, he would not be able to perform any of the jobs.

Because the ALJ failed to directly address the probative evidence concerning the swelling and pain that caused Plaintiff–according to his testimony–to have to elevate his leg above the knee level and apply compression and cryotherapy as needed, the Court is unable to conclude that the decision is supported by substantial evidence. If such evidence is credited, the Plaintiff would be unable to perform any of the jobs at step five. On remand, the ALJ must properly consider the medical and testimonial evidence of the need to elevate and apply compression and cryotherapy to the Plaintiff's knee due to consistent swelling and pain and whether he can perform any jobs.

Ergo, the Plaintiff's Motion for Summary Judgment [d/e 10] is ALLOWED.

The Defendant's Motion for Summary Affirmance [d/e 12] is DENIED.

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Clerk shall enter a Judgment.

This decision of the Commissioner of Social Security is reversed and this cause is remanded for further proceedings.

ENTER: March 29, 2017

FOR THE COURT:

                                           s/Richard Mills
                                           Richard Mills
                                           United States District Judge